UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MICHAEL HUNT and MATTHEW DOWD     )
                         )
              Plaintiffs,  )
                         )
    v.                    )
                         )
CITY OF LOS ANGELES, a      )
municipal corporation,      )
                         )
             Defendant.  )
_____)

Case No. CV 06-04691 DDP (SSx)

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

[Cross-Motions for Summary Judgment filed on October 27, 2008]

    This case is another in the line of cases challenging, on First Amendment grounds, ordinances regulating vending on the Venice Beach Boardwalk.  Asserting an action under 28 U.S.C. § 1983, Plaintiffs seek damages for First Amendment violations of three now-inactive Los Angeles City Ordinances: LAMC § 42.15 (2004), LAMC § 42.15 (2006), and LAMC § 63.44(B)(3), (7), (22) & (23).  The parties filed Cross-Motions for Summary Judgment on the constitutionality of these ordinances.  After reviewing the materials submitted by the parties and hearing oral argument, the Court grants Plaintiffs' Motion as to the 2004 version of § 42.15 because the ordinance was unconstitutionally vague, and grants

1  Defendant's Motion as to the 2006 version of § 42.15 because

2  Plaintiffs were not engaged in protected speech.  Because

3  Plaintiffs agreed at oral argument that their suit centers on the

4  two versions of § 42.15, the Court does not address the challenged

5  provisions of LAMC § 63.44(B).

6  **I.    BACKGROUND**

7       Plaintiffs Michael Hunt ("Hunt") and Matthew Dowd ("Dowd")

8  (collectively, "Plaintiffs") have brought suit against the City of

9  Los Angeles ("City"), facially challenging various provisions of

10 the Los Angeles Municipal Code.

11      A.   <u>Los Angeles Municipal Code §§ 42.15 (2004) & 42.15 (2006)</u>

12      Speech and vending regulation on the Venice Beach Boardwalk

13 has an extensive litigation history.  As City ordinances have

14 recognized, "the Boardwalk at Venice Beach is world-famous for its

15 free performances and public expression activities."  Leung Decl.

16 Ex. 1 at 1 (LAMC § 42.15 (2004)).  In addition to the cases on the

17 topic that have come before this Court, the Ninth Circuit has

18 considered prior versions of Los Angeles Municipal Code § 42.15,

19 the ordinance at issue here.  <u>See</u> <u>Perry v. Los Angeles Police</u>

20 <u>Dep't</u>, 121 F.3d 1365 (9th Cir. 1997).  This case challenges two

21 versions of that ordinance.[1]  In general, both versions of LAMC

22 § 42.15 at issue here regulate vending on the west side of Venice

23 Beach Boardwalk.

24 _____

25      [1]Plaintiffs' complaint also challenges four subdivisions of
   LAMC § 63.44(B), all of which have been suspended until further
26 action since October 1, 2005, and the parties' briefs discuss the
   facial validity of these sections.  Though they noted that both
27 plaintiffs were threatened under § 63.44, at oral argument,
   Plaintiffs explained that they are primarily challenging the two
28 versions of § 42.15.  Accordingly, this Order does not address
   § 63.44.

1.   <u>LAMC § 42.15 (2004)</u>

In 2004, City amended a prior version of § 42.15.  As amended, § 42.15 (2004) prohibited persons from "hawk[ing], peddl[ing], vend[ing] or sell[ing], or request[ing] or solicit[ing] donations for, any goods, wares, merchandise, foodstuff or refreshments" on the Boardwalk.  LAMC § 42.15(A).  It contained an exception, however.  Section 42.15(C) provided:

> Nothing in this section shall be construed to prohibit the sale . . . of newspapers, magazines, periodicals, or other printed matter commonly sold or disposed of by news vendors. . . .
>
> This section shall not prohibit the sale of merchandise constituting, carrying or making a religious, political, philosophical or ideological message or statement which is inextricably intertwined with the merchandise. Nor shall the provisions of this section prohibiting sales or soliciting of donations apply to any performer or musician engaging in constitutionally protected activities, or to any painter, sculptor or photographer, provided the painter, sculptor or photographer is displaying his or her own original creations and/or limited editions.

LAMC § 42.15(C).

Additionally, LAMC § 42.15 (2004) set up a permit process and expression "spaces" for sales of exempted items.  Subdivision (D) provided that "[n]o person shall receive any payment or accept any donation in connection with any activities not otherwise prohibited by this section unless that person holds a valid 'Public Expression Participant Permit.'"  LAMC § 42.15(D).  Permit holders were

3

1  required to remain in their allotted permit space and prohibited

2  from "conduct[ing] any activities requiring a permit outside the

3  boundaries of the permitted space."  Id.

4         2.   LAMC § 42.15 (2006)

5       In August 2005, City suspended the 2004 version after a group

6  of plaintiffs filed a lawsuit against the City captioned Venice

7  Food Not Bombs v. City of Los Angeles, No. CV 05-04998 DDP (SS)

8  (C.D. Cal. 2005).[2]  Between September 2005 and January 2006, the

9  City held three televised public hearings to take testimony

10 regarding proposed amendments to the suspended ordinance.  On

11 January 30, 2006, the Los Angeles City Council amended section

12 42.15; the new ordinance took effect on March 25, 2006.  According

13 to the City, the Council modeled the amended ordinance on two court

14 decisions, Mastrovincenzo v. City of New York, 435 F.3d 78 (2d Cir.

15 2006), and People v. Foote, 110 Cal. Rptr. 2d 260 (2001).

16      The 2006 version of § 42.15 provided that "[n]o person shall

17 engage in vending activity" upon the Venice Beach Boardwalk.  Leung

18 Decl. Ex. 2 (LAMC § 42.15 (2006)).  It exempts the following:

19      (1)  Any individual or organization vending newspapers,

20           leaflets, pamphlets, bumper stickers or buttons;

21      (2)  Any  individual  or  organization  that  vends  the

22           following items, which have been created, written or

23           composed by the vendor: books, cassette tapes, compact

24           discs, digital video discs, paintings, photographs,

25           sculptures  or  any  other  item  that  is  inherently

26

27 ────────────────

28      [2]The Court dismissed this case on September 29, 2006, after
   the parties notified the Court that they had reached a settlement.

                                 4

1    communicative and has nominal utility apart from its

2    communication;

3    Although an item may have some expressive purpose, it

4    will be deemed to have more than nominal utility apart

5    from its communication if it has a common and dominant

6    non-expressive purpose.  Examples of items that have

7    more   than   nominal   utility   apart   from   their

8    communication and thus may not be vended under the

9    provisions of this section, include, but are not

10    limited to, the following: housewares, appliances,

11    articles of clothing, sunglasses, auto parts, oils,

12    incense, perfume, lotions, candles, jewelry, toys, and

13    stuffed animals;

14  (3)  Performances by performing artists and musicians.

15 LAMC § 42.15(c)

16  Under section 42.15(e), any person engaging in exempt

17 activities on the Venice Beach Boardwalk first was required to

18 obtain a "Public Expression Participant Permit" issued pursuant to

19 the Venice Beach Boardwalk Public Expression Permit Program adopted

20 by the Board of Recreation and Parks Commission.

21  Permit holders were not guaranteed space on the Boardwalk,

22 however.  The Program Rules set up a lottery system to allocate the

23 spaces among permit holders.  The permittee to whom the space was

24 assigned pursuant to the program rules had priority to use the

25 space.  § 42.15(e).  After 12:00 p.m. daily, any person or

26 organization could use any unoccupied space for the remainder of

27 the day "for activities specifically exempted . . . by Subsection

28 (C)," whether or not they held a permit, so long as they

5

1    relinquished the space upon arrival of a permit holder assigned to

2    the space.   Id.

3         In passing the 2006 version of § 42.15, the City Council

4    adopted a statement of "findings and purpose."  It found, *inter*

5    *alia*, that unregulated vending "adversely affects the historic

6    character of the Venice Beach Boardwalk by deterring tourists from

7    visiting and shopping along the Boardwalk resulting in an economic

8    and cultural loss to the City"; that it "impedes the orderly

9    movement of pedestrian traffic and may make the Boardwalk unsafe

10   for pedestrians by limiting the City's ability to effect crowd

11   management and control"; that it "may impede the ingress and egress

12   of emergency and public safety vehicles by creating physical

13   obstacles to emergency response and administration of aid to those

14   in need of immediate medical attention and to victims of criminal

15   activity"; that it "undermine[s] the Boardwalk's commercial life by

16   reducing sales from local merchants thereby eroding the City's tax

17   revenues due to unfair competition, and by offering additional

18   opportunity for the sale of stolen, defective or counterfeit

19   merchandise"; and that it "causes visual clutter/blight along the

20   Boardwalk, impeding views of the beach and the Pacific Ocean

21   threatening the City's ability to attract tourists and preserve

22   businesses along the Boardwalk."  LAMC § 42.15(a).

23        In the wake of litigation, City amended § 42.15.  The new

24   version took effect on May 19, 2008.

25        B.   Plaintiffs Michael Hunt and Matthew Dowd

26        Hunt and Dowd sell or solicit donations for merchandise on the

27   Venice Beach Boardwalk as a way of making income.  Hunt and Dowd

28   both obtained "Public Expression Permits" under LAMC § 42.15

1   (2004).  Upon applying for the permits, they signed a copy of the

2   "Venice Beach Boardwalk Public Expression Permit Program Rules

3   (rev. 7/13/05)," certifying that they had read and agreed to abide

4   by the rules and LAMC § 42.15.  The permits had no expiration date

5   and were lifetime permits unless revoked or lost.  Permit holders

6   who did not comply with City laws or the public expression permit

7   program rules were subject to revocation of their permit.  A permit

8   could be revoked following three violations of the Program Rules,

9   § 42.15, or a combination thereof.

10       Hunt is known as "The Butter Man" on the Venice Beach

11   Boardwalk, where he has promoted shea butter for several years.

12   Hunt Decl. ¶¶ 4-5.  According to Hunt, shea butter "has healing

13   powers and health benefits derived from an ancient African nut

14   extract"; it "originates from West Africa and is distributed by

15   Muslim mosques." <u>Id.</u> ¶ 4.  He sets up his shea butter stand with

16   three different tables, with tablecloths and roses "to make it the

17   Garden of Eve and really just make it really look nice and smell

18   good, as if I was in heaven."  Leung Decl., Ex. 5 ("Hunt Depo."),

19   at 12:21-13:2.  Hunt has developed a "script" he uses on the

20   Boardwalk.  He calls out to passers by, *inter alia*: "Here's what

21   you gotta ask yourself ... Have you been buttered up today?" Hunt

22   Decl., ¶ 5.  When customers approach, he gives them a sample and

23   explains that shea butter "comes from the shea nut from a tree in

24   Africa"; that it has been around for hundreds of years; that it

25   "has Vitamin A and Vitamin E and gets rid of stretch marks, scars,

26   blemishes and eczema." <u>Id.</u>  "[A]fter [he] actually [does] some

27   therapeutic healing to their hands and anoint[s] the butter on

28   them, [he] actually [goes] into what [he does] and what the cost is

and everything." Hunt Depo., at 16:10-13. Hunt characterizes his message as telling customers to "'Get buttered up and get buttered down.'" Id. at 18:2-6. Hunt has been cited at various points under the provisions at issue here.[3]

Dowd has developed a unique flavor of hand-made incense called "Pacific Breeze," which he asserts is a famous Venice Beach "original." The flavor combines the scent of coconut, mango, strawberry, and perfume; it is not available commercially. In addition to Dowd's unique incense sticks, Dowd's products include "flat wooden incense holders which bear brass engraved" messages as well as "coffin style wooden boxes for burning incense" from India which bear a number of symbols including the yin-yang, dragon, elephant, stars and moon, and sun, as well as ceramic oil burners. Dowd Decl. ¶ 4; Leung Decl., Ex. 6 ("Dowd Depo.") at 11:14-22. Dowd "believe[s] . . . that the burning of incense symbolizes the breakdown of a being from an organic state into a molecular state, and the release of energy back into the biosphere." Dowd Decl., ¶ 4. Dowd's "coffin box symbolizes a funeral casket, and the resultant ashes are the by-product of the energy transfer by combustion of the organic material." Id. Dowd also notes that "[t]he burning of incense and oils features in the practice of most of the world's religions." Id.

---

[3]The parties dispute whether (or how often) Hunt has been arrested under the ordinances. Hunt claims to have been arrested twenty-four times pursuant to the ordinances; City claims that at least some of these arrests were related to a bomb threat. City does not appear to claim that Plaintiffs were not cited under the ordinance at all. City does make various evidentiary objections to the Hunt and Dowd Declarations.

To promote his Pacific Breeze incense, Dowd distributes his card, which operates as a flyer, on the Boardwalk, and also displays a sign that explains the symbols on the coffin boxes.  For example, according to the sign, the yin-yang symbol represents "the balance of life and how nothing is black and white and the symbol itself has white inside of black" and "no matter how you try to separate things, there's always going to be the edge where the black touches the white and that point is going to be gray."  Dowd Depo. at 13:12-19.  Additional literature included leaflets that "explained how to utilize the coffin box and the oil burner" he was selling, and "a small flier which looked a little like a business card, which had [his] address, it had a photo, and it had the name 'Pacific Breeze,' and [Dowd's] email address."  Id. at 12:2-9.  He handed out those business card fliers "when [he] discussed [his] incense creation with [passers-by]."

As Dowd characterized his activities: "The primary message is my original design incense.  The incense holders are an essential device with which to burn the incense; so they're intertwined with the incense in that fashion, but they also hold their own individual symbolism. But they're not the primary message[.]" Rather, the primary message was "[t]hat I've created and designed my own original flavor which I believe is better than a lot of the other commercially available incense that are out there."  Id. at 15:15-23.

Dowd has been cited on two occasions, and cautioned against setting up a table displaying his incense products.  On April 2, 2006, he received a "Notice of Violation of the Venice Beach Boardwalk Public Expression Permit Program Rules."

9

1          C.   Procedural History

2          Plaintiffs filed this action on July 27, 2006. In February
3    2007, Magistrate Judge Suzanne Segal granted in part and denied in
4    part City's Motion to Dismiss, with leave to amend. Plaintiffs
5    timely filed a First Amended Complaint ("FAC"), and City answered.

6          Plaintiffs make facial challenges to the ordinances at issue
7    here.  Plaintiffs' FAC sought injunctive and declaratory relief and
8    damages for violations of the First Amendment and the Due Process
9    Clause, pursuant to 42 U.S.C. § 1983, and for violations of Article
10   I, Section 2 of the California Constitution.  Because LAMC § 42.15
11   (2004) and the various sections of LAMC § 63.44 at issue had been
12   amended or suspended prior to the time Plaintiffs filed this case,
13   Plaintiffs sought an injunction as to LAMC § 42.15 (2006) and
14   damages as to all three ordinances.  In a further attempt to bring
15   the ordinance into First Amendment compliance, City amended LAMC
16   § 42.15 in 2008.

17         The parties filed Cross-Motions for Summary Judgment in their
18   favor.  Although the parties focus on different arguments at
19   different parts of the papers, their arguments appear to boil down
20   to the following contentions.  City argues that Plaintiffs are not
21   engaged in protected speech.  Additionally, City argues that the
22   various ordinances pass muster under the First Amendment: (1) to
23   the extent they regulate commercial speech, City argues, they are
24   sufficiently tailored; (2) to the extent they regulate protected
25   speech, they are reasonable time, place, and manner restrictions;
26   and (3) none are void for vagueness or unconstitutionally
27   overbroad.  Plaintiffs argue that they are engaged in protected
28   speech.  Additionally, Plaintiffs argue that all three ordinances

1  are facially unconstitutional on the following grounds: (1) they

2  are not reasonable time, place, and manner restrictions; (2) they

3  are void for vagueness; (3) they are overbroad; and (4) they

4  constitute impermissible prior restraints on speech.

5  **II.  LEGAL STANDARD ON SUMMARY JUDGMENT**

6      Summary judgment is appropriate where "the pleadings, the

7  discovery and disclosure materials on file, and any affidavits show

8  that there is no genuine issue as to any material fact and that the

9  movant is entitled to a judgment as a matter of law."

10 Fed. R. Civ. P. 56(c).  All reasonable inferences from the evidence

11 must be drawn in favor of the nonmoving party.  Anderson v. Liberty

12 Lobby, Inc., 477 U.S. 242, 255 (1986).  A genuine issue exists if

13 "the evidence is such that a reasonable jury could return a verdict

14 for the nonmoving party"; and material facts are those "that might

15 affect the outcome of the suit under the governing law."  Anderson,

16 477 U.S. at 248.  A party opposing summary judgment must come

17 forward with specific facts, supported by admissible evidence,

18 showing a genuine issue for trial.  Fed. R. Civ. P. 56(e); Brinson

19 v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

20     The parties agree on the material facts relevant to the issues

21 raised in this motion.[4]  Their disagreement centers on the

22 appropriate legal standards and the implications of those standards

23 on, for example, whether Plaintiffs were engaged in protected

24 speech and whether the ordinances pass constitutional muster.

25 _____

26      [4]There are a few minor areas of disagreement in, for example,
   the number of times Hunt has been arrested under the ordinance.
27 While the disputes in those issues may be relevant to damages, the
   Court does not consider them material to the issues raised in this
28 motion, which are centered on whether Plaintiffs' speech is
   protected and the nature of the ordinances.

## III. DISCUSSION

Plaintiffs bring this 42 U.S.C. § 1983 claim alleging that the various ordinances have infringed their rights under the First Amendment and Due Process Clause of the United States Constitution, as well as their free speech rights pursuant to Article I, Section 2 of the California Constitution, because they are facially unconstitutional. Because the ordinances are no longer in effect, Plaintiffs' prayer for injunctive relief is moot. Plaintiffs' claims for damages remain. See Covenant Media of Cal., L.L.C. v. City of Huntington Park, 377 F. Supp. 2d 828, 843-44 (C.D. Cal. 2005).

Plaintiffs bring a "kitchen sink" attack on the 2004 and 2006 ordinances. They assert that the 2004 and 2006 ordinances are facially invalid on the following grounds: both ordinances are impermissible time, place, and manner restrictions,[5] both ordinances are overbroad and grant unbridled discretion to the licensing authority, and both ordinances are void for vagueness, in violation of the First and Fourteenth Amendments. Arguing that Plaintiffs are not engaged in protected expression, City asserts that Plaintiffs do not have standing to bring their claims. City also argues that the exception provided by the overbreadth doctrine is inapplicable. Additionally, City argues that the ordinances pass constitutional muster.

The Court has considered the various doctrines raised in these Motions for Summary Judgment, and the complicated ways they

---

[5]Plaintiffs alternatively argue that the ordinances do not pass muster under the test for commercial speech. See Pls.' Opp. to Def.'s Mot. Summ. J., at 19-20.

interact in the unique circumstances of this case, where neither
ordinance remains in effect. The Court finds that the 2004
ordinance was unconstitutionally vague.  Because the Court also
finds that Plaintiffs were not engaged in protected activity, the
Court does not reach whether the 2006 ordinance was facially
invalid with respect to fully protected activity.  The Court finds,
however, that the ordinance did not facially violate the
constitution with respect to commercial speech.

A.   General Standing Principles for Facial First Amendment
     Challenges

City challenges Plaintiffs' standing to challenge the
ordinances on these various grounds.  The parties' debate is
twofold.  The parties argue over whether Plaintiffs were engaged in
protected activity.  Additionally, the parties argue over whether
Plaintiffs have standing to challenge the ordinances even if they
were not engaged in protected activity.  The Court is satisfied
that at least one of the Plaintiffs has standing to challenge the
2004 ordinance, but finds that Plaintiffs cannot challenge the 2006
ordinance as a restriction on protected speech.  The 2006 ordinance
is appropriately tailored for commercial speech.

When a plaintiff challenges a statute on its face in the First
Amendment context, the inquiry has two possible paths.  That is,
"[a]n ordinance may be facially unconstitutional in one of two
ways: 'either it is unconstitutional in every conceivable
application, or it seeks to prohibit such a broad range of
protected conduct that it is unconstitutionally overbroad.'"  Foti
v. City of Menlo Park, 146 F.3d 629, 635 (9th Cir. 1998) (quoting

1  <u>Members of City Council v. Taxpayers for Vincent</u>, 466 U.S. 789, 796
2  (1984)).  As the Ninth Circuit explained in <u>Foti</u>:

> In the first type of facial challenge, the plaintiff argues
> that the ordinance could never be applied in a valid manner
> because it is unconstitutionally vague or it impermissibly
> restricts a protected activity. . . . In such a case, the
> litigant has standing to vindicate his own constitutional
> rights. . . .  The second type of facial challenge is an
> exception to our general standing requirements: the plaintiff
> argues that the statute is written so broadly that it may
> inhibit the constitutionally protected speech of third
> parties, even if his own speech may be prohibited.

13 <u>Id.</u> at 635.  A plaintiff who brings an overbreadth challenge need
14 not be engaged in protected activity, but must still articulate
15 some cognizable, redressable injury to have standing.  <u>See Get</u>
16 <u>Outdoors II, LLC v. City of San Diego</u>, 506 F.3d 886, 891 (9th Cir.
17 2007)(explaining that <u>Lujan</u> standing is still required for such
18 claims, but prudential standing limits are relaxed); <u>4805 Convoy,</u>
19 <u>Inc. v. City of San Diego</u>, 183 F.3d 1108, 1112 (9th Cir. 1999).
20 One may challenge only those provisions that applied to him.  <u>Get</u>
21 <u>Outdoors II</u>, 506 F.3d at 892; <u>4805 Convoy</u>, 183 F.3d at 1111-12.

22     On the Court's reading of the jurisprudence, however, an
23 overbreadth challenge on behalf of third parties is unavailable to
24 Plaintiffs here.  Because both of the challenged statutes has been
25 superseded, Plaintiffs' claims for injunctive relief are moot.  <u>See</u>
26 <u>Native Vill. of Noatak v. Blatchford</u>, 38 F.3d 1505, 1510 (9th Cir.
27 1994) (noting that while "a case should not be considered moot if
28 the defendant voluntarily ceases the allegedly improper behavior,

1    but is free to return to it at any time," a "statutory change . . .

2    is usually enough to render a case moot, even if the legislature

3    possesses the power to reenact the statute after the lawsuit is

4    dismissed").  While Plaintiffs' claims for damages for past

5    violations are not rendered moot by the revision of an ordinance,

6    the Ninth Circuit has held that damages "are unavailable on an

7    overbreadth challenge."  Outdoor Media Group, Inc. v. City of

8    Beaumont, 506 F.3d 895, 907 (9th Cir. 2007).  In Outdoor Media, the

9    Ninth Circuit explained that an overbreadth claim "is essentially a

10   claim that a statute may be constitutional as applied to the

11   plaintiff, but sweeps so broad as to unconstitutionally suppress

12   speech of others not before this court. . . .  This theory

13   presupposes that the ordinance is constitutional as applied to the

14   plaintiff."  Id.  As a result, because § 1983 damages "'are

15   available only for violations of a party's own constitutional

16   rights,'" the Ninth Circuit held that a plaintiff could not state a

17   claim for damages under § 1983 when making a challenge to a statute

18   on the basis of the third-party standing exception provided by the

19   overbreadth doctrine.  Id. (quoting Advantage Media, L.L.C. v. City

20   of Eden Prairie, 456 F.3d 793, 801 (8th Cir. 2006)).[6]

21

22   [6]The doctrines of overbreadth, unbridled discretion, and
     vagueness overlap.  See generally Rodney A. Smolla, Smolla and
23   Nimmer on Freedom of Speech §§ 6:1-16 (2008).  The exception to the
     prudential standing limits that exists in the context of
24   overbreadth applies to unbridled discretion/licensing cases as
     well.  See City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750,
25   755-56 (1988) (party need not apply for a license and be denied in
     order to challenge a licensing scheme); United States v. Linick,
26   195 F.3d 538, 541 (9th Cir. 1999).  Accordingly, the same analysis
     as to the availability of damages should apply to such claims.
27   Because vagueness is a due process issue to which the prudential
     standing exceptions do not apply in the same way, see generally
28   Laurence Tribe, American Constitutional Law § 12-32 (2d ed. 1988),
                                                  (continued...)

1     Because the overbreadth exception to prudential standing is

2  unavailable here, Plaintiffs must bring their challenge to

3  vindicate their own constitutional rights.  <u>Foti</u>, 146 F.3d at 635.

4  Accordingly, in discussing the provisions below, the Court first

5  determines whether a particular challenge is appropriately brought

6  by Plaintiffs, and then addresses the merits of the constitutional

7  claim.

8     B.    <u>2004 Ordinance</u>

9        1.   <u>Standing</u>

10    Although they are distinct concepts, overbreadth and vagueness

11 challenges are closely related in the principles they vindicate,

12 and courts often discuss them together.  <u>See, e.g.</u>, <u>Kolender v.</u>

13 <u>Lawson</u>, 461 U.S. 352, 358 n.8 (1983) (explaining that courts have

14 "traditionally viewed vagueness and overbreadth as logically

15 related and similar doctrines"); <u>NAACP v. Button</u>, 371 U.S. 415,

16 432-33 (1963); <u>Adamian v. Jacobsen</u>, 523 F.2d 929, 933 (9th Cir.

17 1975) ("The closely related first amendment doctrines of vagueness

18 and overbreadth permit a defendant to assert the invalidity of a

19 statute because of its potential encroachment on first amendment

20 freedoms, even in cases where the defendant's conduct itself is

21 unprotected by the first amendment.").

22    Not all principles apply to these related doctrines in the

23 same way.  While a plaintiff challenging a statute on overbreadth

24 grounds may vindicate the constitutional rights of others, a party

25 challenging a law on vagueness grounds vindicates his own rights.

26

27       [6](...continued)

28 the Court addresses standing to bring a vagueness challenge
   separately.

16

1    See Foti, 146 F.3d at 365.[7]  That is, vagueness challenges do not

2    benefit from the exception to standing that exists for overbreadth

3    challenges.  In vindicating his own rights under a vagueness

4    challenge, a plaintiff essentially makes a due process claim.

5    Grayned v. City of Rockford, 408 U.S. 104, 108 (1972); United

6    States v. Wunsch, 84 F.3d 1110, 1119 ("[T]he Fifth Amendment due

7    process clause requires a statute to be sufficiently clear so as

8    not to cause persons 'of common intelligence . . . necessarily [to]

9    guess at its meaning and [to] differ as to its application[.]'"

10   (quoting Connally v. General Constr. Co., 269 U.S. 385, 391 (1926))

11   (alterations to internal quote in Wunsch)).  Although a plaintiff

12   may make a facial vagueness challenge when the statute implicates

13   the First Amendment, see Cal. Teachers Ass'n v. State Bd. of Educ.,

14   271 F.3d 1141, 1150-51 (9th Cir. 2001), the general rule is that a

15   plaintiff may not challenge a law on vagueness grounds if it was

16   clear that his conduct was prohibited by the law, even if it was

17   unclear as to someone else.  Parker v. Levy, 417 U.S. 733, 756

18   (1974); see also  United States v. Williams, 128 S. Ct. 1830, 1845

19   (2008); United States v. Johnson, 952 F.2d 565, 579 (1st Cir.

20   1991); United States v. Gilbert, 813 F.2d 1523, 1530 (9th Cir.

21   1987).

22        The Court is satisfied that at least one of the Plaintiffs has

23   standing to challenge the 2004 ordinance.  Hunt, at the very least,

24   has standing to make a due process challenge to the 2004 version of

25

26        [7]As discussed in more detail below, vagueness is a due process

27   concept that applies to all criminal laws; however, when the
     challenged law implicates First Amendment rights, both the form of

28   that challenge and the analysis as to whether it passes
     constitutional muster change.

the ordinance, arguing that it is void for vagueness.  FAC ¶ 34;

Def.'s Mot. at 14.  The 2004 ordinance was enforced against Hunt.

Hunt Decl. ¶ 4.[8]  The 2004 ordinance did not clearly prohibit the

sale of Hunt's shea butter.  As discussed in more detail below,

LAMC § 42.15 (2004) exempts activity that carries or makes "a

religious, political, philosophical, or ideological message or

statement which is inextricably intertwined with the merchandise."

§ 42.15(C) (2004).  While it may be questionable whether Hunt's

activity is expression protected by the First Amendment, his

conduct is not "clearly" proscribed by the ordinance.  The

ordinance provides no specific guidance as to what qualifies as a

message or the types of merchandise that can be or cannot be

"inextricably intertwined" with a message.

     2.  <u>Validity</u>

Plaintiffs argue that the 2004 version of the Venice Boardwalk

vending ordinance is unconstitutionally vague.  The Court agrees.

     a.  <u>The Void-for-Vagueness Doctrine</u>

The void-for-vagueness doctrine is rooted in the basic

guarantees of due process.  <u>Grayned</u>, 408 U.S. at 108.  The doctrine

_____

[8]Although City does not appear to contest Dowd's standing to
sue on vagueness grounds, it is unclear whether Dowd claims he was
arrested, cited, or suffered other injury under the 2004 ordinance
that would give rise to standing to assert a vagueness claim.
Dowd's declaration explains only that he was arrested and cited
under the 2006 ordinance.  Dowd Decl. ¶¶ 4, 14-15; FAC ¶ 6.  Dowd
does allege and declare that he sold merchandise on Venice Beach
Boardwalk under the 2004 ordinance.  Although Dowd was required to
get a public expression permit under the 2004 ordinance, and did
so, he was required to do so even if his merchandise was protected.
Without further information, the Court does not decide whether Dowd
can challenge the 2004 ordinance on vagueness grounds.  The Court
addresses vagueness as a facial matter.

requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. . . . Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, [the Supreme Court has] recognized . . . that the more important aspect of vagueness doctrine is not actual notice, but the other principal element of the doctrine – the requirement that a legislature establish minimal guidelines to govern law enforcement.

Kolender v. Lawson, 461 U.S. 352, 357-58 (1983) (internal quotation marks and citations omitted); Williams, 128 S. Ct. at 1845; Smith v. Goguen, 415 U.S. 566, 572-73 (1974). The void-for-vagueness doctrine is premised on the notion that

[v]ague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abuts upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of those

1    freedoms." Uncertain meanings inevitably lead citizens to

2    "steer far wider of the unlawful zone" . . . than if the

3    boundaries of the forbidden areas were clearly marked.

4    Grayned, 408 U.S. at 108-09.

5        As a due process principle, the void-for-vagueness doctrine

6    operates in situations that do not involve the First Amendment.

7    See, e.g., United States v. Jae Gab Kim, 449 F.3d 933, 941-942 (9th

8    Cir. 2006). Where a statute "clearly implicates free speech

9    rights," however, "two conclusions" follow. Cal. Teachers Ass'n,

10   271 F.3d at 1149; cf. Village of Hoffman Estates v. Flipside, 455

11   U.S. 489, 494-95 (1982). First, a facial vagueness challenge is

12   appropriate. Cal. Teachers Ass'n, 271 F.3d at 1149; Foti, 146 F.3d

13   at 638 n.10.[9]

14       Second, a more stringent vagueness test applies. Cal.

15   Teachers Ass'n, 271 F.3d at 1150. "To trigger heightened vagueness

16   scrutiny, it is sufficient that the challenged statute regulates

17   and potentially chills speech which, in the absence of any

18   regulation, receives some First Amendment protection." Id. The

19   void-for-vagueness doctrine is particularly significant in the

20   First Amendment context because freedom of speech is "delicate and

21   vulnerable, as well as supremely precious in our society . . .

22   [and] the threat of sanctions may deter [its] exercise almost as

23   potently as the actual application of sanctions." NAACP v. Button,

24   371 U.S. 415, 433 (1963). In the vagueness inquiry, like in the

25   context of overbreadth, the requirement that laws be precise is

26

27        [9]There may be some disagreement as to how such a facial
28   challenge works. See United States v. Adams, 343 F.3d 1024, 1035
     n.15 (9th Cir. 2003) (suggesting tension in jurisprudence).

1  aimed at preventing "chill": rather than risk sanctions, citizens

2  will steer far wider than necessary to avoid engaging in prohibited

3  speech; the First Amendment, however, needs breathing space to

4  survive.  Accordingly, "standards of permissible statutory

5  vagueness are strict in the area of free expression." Id. at 432-

6  33; see also Cramp v. Bd. of Pub. Instruction of Orange County,

7  Fla., 368 U.S. 768, 287 (1961) ("The vice of unconstitutional

8  vagueness is further aggravated where, as here, the statute in

9  question operates to inhibit the exercise of individual freedoms

10  affirmatively protected by the Constitution"); Gammoh v. City of La

11  Habra, 395 F.3d 1114, 1119 (9th Cir. 2005) ("A greater degree of

12  specificity and clarity is required when First Amendment rights are

13  at stake").  Of course, due process does not require impossible

14  standards of clarity or mathematical precision, even when a statute

15  implicates First Amendment principles.  Kolender, 461 U.S. at 361;

16  Grayned, 408 U.S. at 110.

17             b.   Vagueness in the 2004 Ordinance

18      The 2004 ordinance is subject to the heightened scrutiny that

19  attends criminal ordinances and ordinances that implicate First

20  Amendment values.  See Reno v. ACLU, 521 U.S. 844, 871-72

21  (1997)(noting that "[t]he vagueness of the CDA is a matter of

22  special concern" because, in addition to the possible chill, the

23  "increased deterrent effect" from criminal sanctions, "coupled with

24  the 'risk of discriminatory enforcement' of vague regulations,

25  poses greater First Amendment concerns than those implicated by

26  . . . civil regulation"); Info. Providers' Coal. for Def. of the

27  First Amendment v. FCC, 928 F.2d 866, 874-76 (9th Cir. 1991) ("The

28  requirement of clarity is enhanced when criminal sanctions are at

issue or when the statute abut[s] upon sensitive areas of basic

First Amendment freedoms." (internal quotation marks omitted)

(alteration in original)).  Indeed, the 2004 ordinance provides for

criminal penalties for its violation.  Additionally, while the

parties dispute whether Plaintiffs were engaged in protected

conduct, it is undisputed that the 2004 ordinance regulates at

least some expressive, protected conduct.  <u>Cf.</u> <u>Cal. Teachers Ass'n</u>,

271 F.3d at 1150.

Plaintiffs direct their vagueness challenge to § 42.15(C),

which provides that the ordinance's prohibition against vending on

the Venice Beach Boardwalk will not prohibit:

> the sale . . . of newspapers, magazines, periodicals, or other
> printed matter commonly sold or disposed of by news vendors.
> . . . This section shall not prohibit the sale of merchandise
> constituting, carrying or making a religious, political,
> philosophical or ideological message or statement which is
> inextricably intertwined with the merchandise. Nor shall the
> provisions of this section prohibiting sales or soliciting of
> donations apply to any performer or musician engaging in
> constitutionally protected activities, or to any painter,
> sculptor or photographer, provided the painter, sculptor or
> photographer is displaying his or her own original creations
> and/or limited editions.

LAMC § 42.15(C).[10]

_____

[10]The ordinance generally and criminally prohibits the vending of any "goods, wares, merchandise, foodstuffs or refreshments" that do not fall under subsection (C).  § 42.15(A)-(B).  To vend exempted items, an individual or organization was required to get a public expression permit.  § 42.15(D).  Even if an individual has a
(continued...)

22

1        Plaintiffs contend that the phrase "constituting, carrying or

2   making a religious, political, philosophical, or ideological

3   message or statement which is inextricably intertwined with the

4   merchandise" is vague, because it fails to "provide explicit

5   standards for those who apply them." Grayned, 408 U.S. at 108.

6   Consequently, they assert, the provision invites arbitrary

7   interpretation and enforcement by public officials.

8        The void-for-vagueness doctrine's three related concerns are

9   all present here.  See Grayned, 408 U.S. at 108-09.  First, it does

10  not provide a person of ordinary intelligence a fair warning as to

11  what the law prohibits – or, in this case, what the law exempts

12  from prohibition.  Although the ordinance sets out a general

13  standard, it neither attempts to define "inextricably intertwined"

14  nor provides guidance by way of example as to what merchandise

15  counts as "inextricably intertwined."  It likewise does not suggest

16  how explicit or what form the religious, political, ideological, or

17  philosophical message must take, or how the ordinance contemplates

18  judging whether the message is inextricably intertwined.  That is,

19  there is no indication as to whether the ordinance imposes an

20  objective standard or whether the author of the expressive conduct

21  need only subjectively feel that he is conveying a message,

22  subjectively know what that message is, and subjectively believe

23  the message and merchandise are inextricably intertwined.  Instead,

24

25

26        [10](...continued)
    public expression permit, that individual violates the ordinance by
27  selling non-exempt items.  When the Court discusses enforcement
    issues below, its primary concern is in that context as opposed to
28  the system for obtaining a permit, which the parties do not address
    in enough detail for the Court to make a determination.

1   the ordinance leaves the exception to the prohibition on sales wide

2   open for interpretation, and application.

3       The use of the "inextricably intertwined" test by the Ninth

4   Circuit in <u>Gaudiya Vishnava Society v. City and County of San</u>

5   <u>Francisco</u>, 952 F.2d 1059, 1064-66 (9th Cir. 1990), and <u>Perry v. Los</u>

6   <u>Angeles Police Department</u>, 121 F.3d 1365, 1368-71 (9th Cir. 1997),

7   does not save the ordinance from vagueness in this context.   In

8   <u>Gaudiya</u>, the Ninth Circuit held that merchandise that is

9   "inextricably intertwined" with a political, religious,

10  philosophical, or ideological message is fully protected.  <u>Id.</u>

11  While the 2004 ordinance uses nearly identical language, it does

12  not explicitly incorporate the Ninth Circuit's <u>Gaudiya</u> standard,

13  nor does City point to any case that would so narrow this

14  interpretation.  Even assuming that the 2004 ordinance in fact

15  mirrors the <u>Gaudiya</u> test,[11] the incorporation of such a legal

16  standard does not automatically confer constitutionality in all

17  respects.  That is, the use of part of a legal standard does not,

18  in and of itself, exempt a statute from a vagueness challenge.  <u>Cf.</u>

19  <u>Reno</u>, 521 U.S. at 873.  As discussed below, in a context as fraught

20  with litigation as the First Amendment, even the incorporation of a

21  general legal standard can leave significant uncertainty.

22  Essentially, the standard is akin to providing that it exempts all

23  constitutionally protected activities from the prohibition on

24  vending.  <u>See</u> Laurence Tribe, American Constitutional Law § 12-29

25

26

27

28
        [11]<u>See</u> <u>Perry</u>, 121 F.3d at 1365.

1  (2d ed. 1988).[12]  Where criminal sanctions are threatened and

2  expression is involved, the Constitution demands more.

3       Second, and relatedly, such a general standard presents a real

4  risk of arbitrary and discriminatory enforcement because it fails

5  to provide sufficient guidance to those who would enforce it.  As

6  mentioned above, § 42.15(C) neither attempts to define nor gives

7  examples of the types of items that will be deemed "inextricably

8  intertwined" with a religious, political, ideological, or

9  philosophical message, or how such determinations will be made.  It

10  is similarly silent on when an item will be deemed to

11  "constitut[e], carry[], or mak[e]" such a message.  As a result,

12  these phrases require the enforcing official to determine when

13  items carry a message, and when that message is "inextricably

14  intertwined" with an item.  Such judgments are necessarily

15  subjective: the nature of a message as well as the depth of the

16  connection between an item and its message are "in the eye of the

17  beholder."  Indeed, the Second Circuit in Mastrovincenzo – the case

18  on which the City primarily relies to support the 2006 version –

19  analogized decisions regarding expressive purpose to the "difficult

20  line-drawing problems" that courts must resolve in First Amendment

21  cases.  See Mastrovincenzo v. City of New York, 435 F.3d 78, 95-96

22  (2d Cir. 2006) ("Regarding the question of when an item's

23  expressive purpose should be considered 'dominant,' we have

24  confidence that district courts will prove capable of making such

25  determinations in much the same way that we distinguished between

26

27       [12]As a result, the incorporation of the legal standard likely

28  would be more helpful to the ordinance in an overbreadth analysis.
   See id.

categories of goods in <u>Bery [v. City of New York</u>, 97 F.3d 689 (2d Cir. 1996)], and in the way that courts have dealt on a case-by-case basis with difficult line-drawing problems in other First Amendment contexts").

With a full factual record before it, a court may indeed be able to determine whether an item "carries" a message or whether a message is "inextricably intertwined" with the item.  An officer patrolling the Venice Beach Boardwalk, however, can rely on nothing other than his or her subjective judgment and experience to guide a decision regarding the dominant purpose of a particular product. By failing to provide guidelines to be used by officials as they make these decisions, § 42.15 permits arbitrary enforcement and runs afoul of the void-for-vagueness doctrine.

This conclusion is reinforced by several cases where similar terms were deemed vague because they required subjective interpretation on the part of the enforcing official.  <u>See, e.g.</u>, <u>City of Chicago v. Morales</u>, 527 U.S. 41, 56-64 (1999) (holding that a provision which criminalized loitering, defined as "to remain in any one place with no apparent purpose," was "inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene," and declaring that it was void for vagueness); <u>Tucson Woman's Clinic v. Eden</u>, 379 F.3d 531, 554-55 (9th Cir. 2004) (concluding that a statute which required that physicians treat patients "with consideration, respect, and full recognition of the patient's dignity and individuality" was void for vagueness because it "subjected physicians to sanctions based not on their own objective behavior, but on the subjective viewpoint of others" (internal quotations and citation omitted));

<u>Free Speech Coal. v. Reno</u>, 198 F.3d 1083, 1095 (9th Cir. 1999) (holding that a provision criminalizing sexually explicit images that "appear[ ] to be a minor" or "convey the impression" that a minor is depicted was unconstitutionally vague because it was unclear "whose perspective defines the appearance of a minor, or whose impression that a minor is involved leads to criminal prosecution"), <u>aff'd sub nom.</u> <u>Ashcroft v. Free Speech Coal.</u>, 535 U.S. 234 (2002).

Moreover, this is not a case where a term that is imprecise standing alone will likely avoid constitutional vagueness problems because it is used "in combination with terms that provide sufficient clarity." <u>Gammoh</u>, 395 F.3d at 1120; <u>see also</u> <u>Kev, Inc. v. Kitsap County</u>, 793 F.2d 1053, 1057 (9th Cir. 1986) (holding that an ordinance that prohibited dancers from "caressing" and "fondling" patrons was not vague "in the context of the other definitions provided in the ordinance" at issue). As mentioned above, § 42.15 does not provide specific examples as to how and when an item is "inextricably intertwined." Rather, the only specifics in the ordinance set out a separate exemption for performers, musicians, painters, sculptors, or photographers. And the details of that exemption are similarly vague: the prohibition on receiving donations or making sales does not apply to "any performer or musician engaging in constitutionally protected activities."

Most items can "carry" a message. Whether or not an item <u>does</u> carry a message that appropriately fits into those categories, and whether or not that message is "inextricably intertwined" with the item, is left (in the first place) entirely to the judgment of the

enforcing official.  This delegation of discretion is overbroad, especially under a heightened inquiry.  The risk in such a situation is that citing and arresting authorities have so much discretion that it may be hard to tell when they are judging the message or the medium, as opposed to diligently exercising their discretion.  See Roberts v. U.S. Jaycees, 468 U.S. 609, 629 (1984) ("The void-for-vagueness doctrine reflects the principle that a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (citations omitted)); Free Speech Coalition, 198 F.3d at 1095 (statute criminalizing material that "appears to be" or "convey[s] the impression" of a minor engaged in explicit sexual activity is void for vagueness because it "does not give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," and it fails to provide explicit standards for those who must apply it, 'with the attendant dangers of arbitrary and discriminatory application'"(quoting Grayned, 408 U.S. at 108-09)).

    The unclear terms of the ordinance are particularly problematic in a context such as this one, where the ordinance criminally regulates at least some protected activity in an area known to be a forum for First Amendment activities.  Those who had expression permits under the law could nevertheless be cited if they were using the permit improperly, i.e., to sell items that do not fall into the exempt "inextricably intertwined" categories.  It may be that the appeals process for permit revocations provided a check on unbridled enforcement discretion in some circumstances.

1  § 42.15(D).  While such an appeals process may have protected

2  permit holders from *losing* their permits arbitrarily, it would not

3  have meaningfully diminished the risk of chill from the ordinance

4  as a whole: violations of the section were separate from violations

5  of the permit program terms, and risked distinct criminal

6  liability.

7       Accordingly, under the stringent test for vagueness that

8  applies where First Amendment rights are involved, the Court finds

9  that § 42.15(C) (2004) was vague on its face in violation of the

10  Constitution.

11       C.   <u>2006 Ordinance</u>

12       Plaintiffs also challenge the 2006 ordinance.  The Court finds

13  that Plaintiffs cannot contest the ordinance as it regulates

14  protected speech, and that the ordinance is not facially invalid in

15  regulating commercial speech.

16       As mentioned above, § 42.15 (2006) prohibits "vending" on the

17  Venice Beach Boardwalk.  LAMC § 42.15 (2006).  "Vending" is

18  essentially defined as the sale of, offer for purchase, or

19  solicitation of donations in exchange for "food, goods, merchandise

20  or services in any area from a stand, table, pushcart, motor

21  vehicle, bicycle, or by a person with or without the use of any

22  other device or other method of transportation."  <u>Id.</u> (b)(3).  As

23  relevant here, subsection (c) exempts from the application of

24  § 42.15

25       any individual or organization that vends the following items,

26       which have been created, written, or composed by the vendor:

27       books, cassette tapes, compact discs, digital video discs,

28       paintings, photographs, sculptures, or any other item that is

1          inherently communicative and has nominal utility apart from

2          its communication.

3    <u>Id.</u> (c)(2).   The ordinance defines the "nominal utility"

4    requirement in the next paragraph by providing that

5          [a]lthough an item may have some expressive purpose, it will

6          be deemed to have more than nominal utility apart from its

7          communication if it has a common and dominant non-expressive

8          purpose.   Examples of items that have more than nominal

9          utility apart from their communication and thus may not be

10         vended under the provisions of this section, include, but are

11         not limited to, the following: housewares, appliances,

12         articles of clothing, sunglasses, auto parts, oils, incense,

13         perfume, lotions, candles, jewelry, toys, and stuffed

14         animals[.]

15   <u>Id.</u>

16        As the Court reads the ordinance, it provides that an item not

17   found in the list of books and other "inherently communicative

18   items" that has expressive elements will nevertheless still be

19   prohibited from vending if the item has "a common and dominant non-

20   expressive purpose."   The ordinance then expressly lists items that

21   are prohibited, including, inter alia, articles of clothing.

22   Although the ordinance uses the list of prohibited items as

23   examples, it does not leave room for these items to have a dominant

24   expressive purpose and therefore be exempt.[13]   Rather, they serve

25   as examples through which to determine whether other items

26

27   _____

28        [13]Indeed, it may run into (further) vagueness or "unbridled
     discretion" problems if it did.

30

1   similarly have more than "nominal utility."[14]  After all, under the

2   ordinance, having more than "nominal utility" is enough to defeat

3   exempted status for an otherwise "inherently communicative" item.

4   See LAMC § 42.15(c)(2)("or any other item that is inherently

5   communicative *and* has nominal utility apart from its communication"

6   (emphasis added)).

7           1.   Standing

8                a.   Vagueness

9       While both Plaintiffs were cited under the 2006 Ordinance,

10  Plaintiffs do not have standing to bring a vagueness challenge to

11  the 2006 ordinance because their activities were clearly proscribed

12  by it.  Parker, 417 U.S. at 756.  That is, with the respect to the

13  merchandise at issue here, the 2006 ordinance does not lack clarity

14  to the same degree as the 2004 ordinance.  The 2006 ordinance

15  exempts from the vending ordinance "any . . . item that is

16  inherently communicative and has nominal utility apart from its

17  communication." § 42.15(c)(2) (2006).  It sets out as non-

18  exclusive examples of items that "have more than nominal utility

19  . . . and thus may not be vended": "housewares, appliances,

20  articles of clothing, sunglasses, auto parts, oils, incense,

21  perfume, lotions, candles, jewelry, toys, and stuffed animals."

22  Id.  Hunt's shea butter did not *exactly* fit into these prohibited

23  examples, but it naturally and squarely fell within their reach.

24  The ordinance clearly prohibited "lotions" and "oils."  Although

25  the ordinance did not explicitly mention shea butter, Hunt

26  characterized shea butter as being used in the same way – and thus

27  _____

28          [14]The items in the list have more than nominal utility "and
    thus may not be vended."

31

1   having the same "utility" – as lotions and oils.  See Hunt Decl.

2   ¶ 4.  In light of the prohibition on oils and lotions, any argument

3   that it was not clear whether the ordinance also prohibited the

4   sale of shea butter has little, if any, logical force.  The

5   ordinance was even more express with respect to Dowd's incense, an

6   item explicitly listed as having more than nominal utility.  The

7   2006 ordinance did not expressly proscribe the coffin-like boxes

8   adorned with brass symbols that Dowd also sold.  While Dowd may

9   have a stronger argument that the ordinance did not clearly

10  prohibit the sale of the coffin boxes, those boxes are used "for

11  burning incense within," Dowd Decl. ¶ 4, and are therefore only

12  nominally distinct from the candles and incense explicitly listed.

13  Additionally, Dowd claims that he was arrested, cited, and warned

14  about the sale of *incense*.  Accordingly, Plaintiffs cannot make a

15  due process vagueness challenge to the 2006 ordinance.

16              b.   Protected activity

17      In order to challenge the constitutionality of the ordinance

18  as a facially invalid time, place, and manner regulation,

19

20

21

22

23

24

25

26

27

28

1   Plaintiffs must be engaged in protected activity.[15]   See Subsection

2   III(A), supra, pp. 11-14.

3       The sale of merchandise can constitute fully protected

4   activity under the First Amendment.   The Ninth Circuit first

5   addressed the question of when the sale of merchandise is protected

6   in Gaudiya Vishnava Society v. City and County of San Francisco,

7   952 F.2d 1059 (9th Cir. 1990).   In Gaudiya, the plaintiffs were

8   five organizations engaged in a variety of charitable, religious,

9   and political activities in San Francisco.   952 F.2d at 1060.   In

10  conjunction with activities like performing sanskirtan (a public

11  religious ritual), distributing literature, and soliciting

12  signatures on petitions, the plaintiff organizations solicited

13  donations for, or sold, merchandise bearing messages related to the

14  organizations' beliefs.   Id.   That merchandise included message-

15  bearing t-shirts and clothing, buttons, jewelry, stuffed animals,

16  postcards, bumpers stickers, and literature.   Id.   The plaintiff

17  organizations challenged a San Francisco ordinance that prohibited

18  them from selling any merchandise other than books, pamphlets,

19

20       [15]If they are engaged in protected activity, Plaintiffs may
21  argue that the statute facially violates the Constitution.  As a
    practical matter, this analysis may not be different than an
22  overbreadth challenge.   Nunez by Nunez v. City of San Diego, 114
    F.3d 935, 949 (9th Cir. 1997) ("Technically, the overbreadth
23  doctrine does not apply if the parties challenging the statute
    engage in the allegedly protected expression.  Brockett v. Spokane
24  Arcades, Inc., 472 U.S. 491, 504 (1985). This does not mean that
    plaintiffs cannot challenge an ordinance on its face, however, if
25  the ordinance restricts their own constitutionally protected
    conduct. Plaintiffs may seek directly on their own behalf the
26  facial invalidation of overly broad statutes that 'create an
    unacceptable risk of the suppression of ideas,' Secretary of State
27  of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 965 n. 13 (1984)
    (internal quotation omitted); thus, whether the 'overbreadth
28  doctrine' applies to their First Amendment challenge is more of a
    technical academic point than a practical concern.").

buttons, bumper stickers, posters, or "items that have no intrinsic value other than to communicate a message" in the Fisherman's Wharf or Union Square areas of San Francisco without a commercial peddler's permit.  <u>Id.</u> at 1060-61.  The <u>Gaudiya</u> court was faced with a question of first impression: "whether the sale of merchandise which carries or constitutes a political, religious, philosophical or ideological message falls under the protection of the First Amendment."  <u>Id.</u> at 1063.

The <u>Gaudiya</u> court rejected San Francisco's "purely communicative value" test, and held that the items were protected. The court first noted the well-established principle that "an expressive item does not lose its constitutional protections because it is sold rather than given away."  952 F.2d at 1063. The court then considered Supreme Court precedent addressing the relationship between commercial speech and pure speech, particularly the Court's decisions in <u>Village of Schaumburg v. Citizens for a Better Environment</u>, 444 U.S. 620 (1980), <u>Riley v. National Federation for the Blind of North Carolina, Inc.</u>, 487 U.S. 781 (1988), and <u>Board of Trustees of the State University of New York v. Fox</u>, 492 U.S. 469 (1989).  As the Ninth Circuit explained those decisions, <u>Schaumburg</u> held that a transaction is not purely commercial when it "'is not primarily concerned with providing information about the characteristics and costs of the goods and services,'" 952 F.2d at 1063 (quoting <u>Schaumburg</u>, 444 U.S. at 630), and <u>Riley</u> and <u>Fox</u> established that "the level of First Amendment scrutiny depends upon the nature of the speech taken as a whole," <u>id.</u> at 1064, i.e., that "'where . . . the component parts of a

34

1   single speech are inextricably intertwined, we cannot parcel out

2   the speech,'" id. (quoting Riley, 487 U.S. at 781).

3       In light of that precedent, the Gaudiya court explained that

4   while the street sale of merchandise involves "commercial

5   communication by the sales force," the merchandise in this

6   situation was distinct from commercial speech in that the

7   organizations "[sold] their merchandise in conjunction with other

8   activities in order to disseminate their organizations' message."

9   Id.  That is, the groups "inform individuals of their causes

10  through distributing their literature, engaging in persuasive

11  speech, and selling merchandise with messages affixed to the

12  product."  Id. (emphasis added).  "Where the pure speech and

13  commercial speech by the [organizations] during these activities is

14  inextricably intertwined, the entirety must be classified as

15  noncommercial, and [the court] must apply the test for fully

16  protected speech."  Id.[16]

17      Since Gaudiya, the Ninth Circuit has reaffirmed its holding

18  that the sale of merchandise inextricably intertwined with a

19  religious, political, ideological, or philosophical message is

20  fully protected by the First Amendment.  In One World One Family

21  Now v. City and County of Honolulu, 76 F.3d 1009 (9th Cir. 1996),

22  the court applied Gaudiya to hold that the sale of t-shirts bearing

23  messages such as "Protect and Preserve the Truth, the Beauty, &

24

25      [16]The Ninth Circuit explained that the O'Brien test for
26  expressive conduct regarding symbolic items did not apply because
    the question in merchandise-vending cases is "whether the
27  commercial and pure elements of speech are inextricably
    intertwined."  952 F.2d at 1065 (referring to United States v.
28  O'Brien, 391 U.S. 367 (1968), and Texas v. Johnson, 491 U.S. 397
    (1989)).

Harmony of our Native Cultures" was fully protected.  76 F.3d at
1012.  In Perry v. Los Angeles Police Department, 121 F.3d 1365 (th
Cir. 1997), the court held that items being sold – music, buttons,
and bumper stickers bearing political, religious, and ideological
messages - were of the same type of merchandise protected in
Gaudiya, and therefore protected.  121 F.3d at 1368.  Additionally,
the Perry court held that protection under Gaudiya did not depend
on the non-profit status of the seller.  See also Nordyke v. King,
319 F.3d 1185, 1190 (9th Cir. 2003) (where symbols on a gun, not
the gun itself, convey a political message such as "The Right of
the People to Keep and Bear Arms," the gun likely represents a form
of political expression).

Recently, in White v. City of Sparks, 500 F.3d 953 (9th Cir.
2007), the Ninth Circuit appeared to hold that Gaudiya does not
apply in all circumstances where merchandise is sold.  The
plaintiff in White was a painter of nature scenes, which, the
plaintiff believed, conveyed the message that "human beings are
driving their spiritual brothers and sisters, the animals, into
extinction." 500 F.3d at 954.  The defendant City argued that
White's paintings were not protected "because they do not patently
express a religious, ideological, political, or philosophical
message." Id.  The district court applied Gaudiya broadly and held
that these items are fully protected.  Id. at 954-55.

While it affirmed the district court's decision, the Ninth
Circuit took a slightly different approach.  The Ninth Circuit
noted that "[t]he merchandise at issue in Gaudiya . . . lacked
inherent expressive value and gained expressive value only from its
sale being 'inextricably intertwined' with pure speech." Id. at

955.  "To the extent that visual art is inherently expressive," the court explained, "the <u>Gaudiya</u> test is inapplicable."  <u>Id.</u>  Rather, the court held that White's art was in itself protected because "[i]n painting, an artist conveys his sense of form, topic, and perspective."  <u>Id.</u> at 956.  "So long as it is an artists self-expression, a painting will be protected under the First Amendment, because it expresses the artists's perspective."  <u>Id.</u>  The <u>White</u> court refused to set a blanket rule as to all visual art.  <u>Id.</u> at n.4.

In distinguishing <u>Gaudiya</u>, the <u>White</u> court suggested that courts should ask a threshold question where the sale of allegedly expressive merchandise is at issue: a court should first determine whether the merchandise is "inherently expressive," a determination that appears to rest in significant part on its medium.  If so, then it likely is protected.  If not, a court should then ask whether the sale of the merchandise is "inextricably intertwined" with pure speech, and is therefore protected under <u>Gaudiya</u>.[17]

---

[17]This distinction based on the expressive quality of the medium bears similarity to the Second Circuit's approach. <u>Mastrovincenzo v. City of New York</u>, 435 F.3d 78 (2d Cir. 2006); <u>Bery v. City of New York</u>, 97 F.3d 689, 695 (2d Cir. 1996).  In the Second Circuit, paintings, photographs, prints and sculptures are deemed to "always communicate some idea or concept to those who view it, and as such are entitled to full First Amendment protection."  <u>Bery</u>, 97 F.3d at 696.  Where an item falls outside those categories, the court must determine first whether an item could be objectively understood to have expressive or communicative elements, usually by looking to the messages affixed to the item or other qualitative elements.  <u>Id.</u> at 96.  "Once a court has determined that an item possesses expressive elements, it should then consider whether that item also has a common non-expressive purpose."  <u>Id.</u> at 95.  If an item has a common non-expressive purpose, the court then determines whether that non-expressive purpose is dominant or not.  <u>Id.</u>  Courts gauge the relative importance of an item's expressive character on a case-by-case basis, considering issues such as price, the seller's stated
(continued...)

i.   _Gaudiya_ Applies

The merchandise at issue here – shea butter, incense, and incense and oil holders – is not expressive in the way that books, music, and paintings inherently, primarily communicate.  See White, 500 F.3d at 955-56.  (Indeed, Plaintiffs do not attempt to classify their products as visual art like that considered in White or addressed by the Second Circuit in Bery.)  Rather, the merchandise fits better with the types of merchandise at issue in Gaudiya – t-shirts, jewelry, and stuffed animals.  Accordingly, in order for the items to be fully protected, they must be "inextricably intertwined" with a political, religious, ideological, or philosophical message.

ii.   Plaintiffs' Merchandise Is Not
"Inextricably Intertwined" with a Message

The Court finds that Plaintiffs are not engaged in protected activity under the standards announced in Gaudiya.  Few courts have applied Gaudiya's "inextricably intertwined" test.  As mentioned above, courts have found merchandise to be inextricably intertwined when it explicitly bore a message and when the sale of the item was related to the message the plaintiffs were trying to convey – that is, in cases where the activity can fairly be characterized as the dissemination of a message through the sale of the merchandise.  See Gaudiya, 952 F.2d at 1064 (noting that the Supreme Court has held that "the level of First Amendment scrutiny depends on the nature of the speech taken as a whole").

---

[17](...continued)
motivation, and whether a seller purports, through the sale of goods, to be engaging in an act of self-expression rather than a mere commercial transaction.  Id. at 96, 97.

On the other hand, applying <u>Gaudiya</u>, at least one district court has found the types of items at issue here not fully protected speech.   In <u>Al-Amin v. City of New York</u>, 979 F. Supp. 168 (E.D.N.Y. 1997), the plaintiffs challenged New York's General Vendors Law.   The plaintiffs stationed themselves at a mall, where they allegedly propagated information concerning their religion, and solicited donations in exchange for books, pamphlets, perfume oils, incense, and bracelets.   979 F. Supp. at 169.   The court found the case distinguishable from <u>Gaudiya</u> and the t-shirt cases "because the goods themselves [did not] bear a message, nor [did] their sale convey a particularized message."   <u>Id.</u> at 173.   The court rejected plaintiffs' contention that their activities were inextricably intertwined with speech because they were "simultaneously involved in disseminating written matter about Islam and propagating the message of Islam by engaging pedestrians in discussion."   <u>Id.</u>   The court's holding seemed to rest in part on the fact that plaintiffs' sale of goods was done primarily to make a living, as opposed to communicate a message.   <u>Id.</u>   See also <u>ISKCON of the Potomac v. Kennedy</u>, 61 F.3d 949, 961 (D.C. Cir. 1995) (Ginsburg, J., concurring in part and dissenting in part); <u>People v. Foote</u>, 110 Cal. Rptr. 2d 260 (Super. Ct. App. Div. 2001).

The Supreme Court's holding in <u>Fox</u>, on which <u>Gaudiya</u>'s reasoning relied, provides some additional guidance.   See <u>Fox</u>, 492 U.S. at 473-75.   In <u>Fox</u>, the plaintiffs argued that sales presentations for housewares that also touched on subjects such as financial responsibility and efficiency were fully protected.   The Court held that there was "nothing whatever inextricable about the commercial aspect of these presentations."   <u>Id.</u>   The Court

1    suggested that commercial speech does not become inextricably

2    intertwined just because it is "linked" to noncommercial issues.

3    Id. at 475.

4         Plaintiffs primarily argue that the sale of their merchandise

5    is fully protected by virtue of the fact that this merchandise has

6    some association with some religion, not necessarily any connection

7    with a message they are trying to communicate.  Hunt explains shea

8    butter is "inextricably intertwined" with a message because it

9    "originates from West Africa and is distributed by Muslim mosques."

10   Hunt Decl., ¶ 4.  Dowd explains that the products he sells are

11   "inextricably intertwined" with a message because they are

12   "associated with religious rituals including funerals and other

13   spiritual ceremonies and meditation."  Dowd Decl., ¶ 4.  See Pls.'

14   Opp. to Def.'s Mot. Summ. J., at 3-6.

15        The jurisprudence does not support this argument, and the

16   Court cannot endorse it.  Gaudiya does not afford full protection

17   to the sale of an item simply because the item is associated with a

18   religion.  Under Plaintiffs' logic, any vendor of any item that

19   might in some way be associated with religion – arguably, this

20   could include water or any candles – is automatically entitled to

21   full protection, whether or not that vendor attempts to communicate

22   a message through its sales.  Indeed, in a point that highlights

23   the potential breadth of protection implicated by their argument,

24   Plaintiffs emphasize the cases holding that this Court should not

25   evaluate the centrality or plausibility of an item to a religion.

26        The items are not otherwise inextricably intertwined with the

27   communication of a political, ideological, philosophical, or

28   religious message.  Rather, the circumstances of this case and

1    these plaintiffs suggest that the sale of Plaintiffs' merchandise

2    and any associated messages are primarily commercial in nature.

3         In many ways, Plaintiffs fall into a gray area left by the

4    jurisprudence as it attempts to balance "the First Amendment's

5    fundamental purpose . . . to protect all forms of peaceful

6    expression in all of its myriad manifestations," Bery, 97 F.3d at

7    694, with the task of also making meaningful distinctions between

8    expression and non-expression, and commercial speech and fully

9    protected speech.  On the one hand, Gaudiya protects merchandise

10   that is inextricably intertwined with expression, and other First

11   Amendment cases suggest that messages need not be clear, that

12   visual art is a means of communicating, and that courts must be

13   careful not to scrutinize the message, the means, or the quality –

14   all of which counsel in favor of an extremely broad view of the

15   First Amendment.  Indeed, taking such principles together,

16   protection could be limitless.[18]  On the other hand, Gaudiya, One

17   World, and Perry have all concerned messages affixed to products

18   through slogans (as opposed to communication through a product

19   itself or through the attachment of common symbols), or have

20   suggested that other, "purer" speech practices (such as

21   distributing leaflets and seeking signatures) were also part of the

22   equation that rendered them fully protected.  But it is likewise

23   _____

24        [18]For example, assume a vendor of automobile parts sells a
     tire.  Without an accompanying message, the vendor is simply
25   engaged in selling.  If the vendor thinks of a message – such as "I
     think technology drives our society, and the rubber tire symbolizes
26   how far man has come since the invention of the wheel" or "the
     great wheel of life" – but does nothing more to communicate this
27   message through the sale of the tire than to state it
     simultaneously, it seems absurd to think that the sale of the tire
28   nevertheless automatically becomes fully protected.  We could think
     of symbolism for nearly any item.

problematic to limit the "inextricably intertwined" test to an affixed message that uses words or is "clear," both because distinctions such as this one can be arbitrary, and because other First Amendment principles, like those expressed in White with respect to visual art, counsel against it.

Ultimately, when courts consider whether the sale of merchandise is inextricably intertwined with a protected message, courts seem to be addressing the predominant purpose of the sale, as judged by the circumstances. The Gaudiya court described the Supreme Court's holdings in Riley and Fox as discussing "the nature of the speech taken as a whole." 952 F.2d at 1064. Indeed, in holding that the items at issue there were inextricably intertwined with expression, the court noted that the organizations were "sell[ing] their merchandise in conjunction with other activities in order to disseminate their organizations' message." Id. That is, they were "inform[ing] individuals of their causes through distributing literature, engaging in persuasive speech, and selling merchandise with messages affixed to the product." Id. Though it may have put more emphasis than the Ninth Circuit would allow on the non-charitable nature of the plaintiffs' activities, see Perry, 121 F.3d at 1370-71, the Al-Amin court essentially took a similar approach. See Al-Amin, 979 F. Supp. at 173-74. And the Second Circuit now specifically tasks courts with performing this analysis. Mastrovincenzo, 435 F.3d at 95-96; see Note 17, supra, pp. 37-38.

A number of factors may signal the predominant purpose of such a sale, depending on the circumstances. Medium is one way to make such a determination. See White, 500 F.3d at 955-56;

1   <u>Mastrovincenzo</u>, 435 F.3d at 94-96.  Another is the activities in

2   which the plaintiff is simultaneously engaged.  <u>See</u> <u>Gaudiya</u>, 952

3   F.2d at 1064; <u>Fox</u>, 492 U.S. at 473-75.  Others include the

4   motivations of the plaintiff, the extent of expressive elements,

5   and the effect of expressive elements on price.  <u>Mastrovincenzo</u>,

6   435 F.3d at 96-97.  Indeed, it seems to the Court that these

7   merchandise cases essentially address a continuum.  On one end, the

8   merchandise *is* itself a form of speech (like a book, a painting, or

9   music) and <u>Gaudiya</u> does not apply; on the other end, a vendor

10  proposes a sale of a common product, or the sale of a common

11  product is merely "linked" to a protected message, <u>see</u> <u>Fox</u>, 492

12  U.S. at 475.  As the Second Circuit has recognized in both <u>Bery</u> and

13  <u>Mastrovincenzo</u>, it would be problematic to draw a clear line

14  between these two poles, and likely impossible to do so in a way

15  that gets the First Amendment question right most of the time.

16  Rather, it appears that this is a situation where the jurisprudence

17  has begun to develop on a case-by-case basis, in light of the

18  circumstances of each case.[19]

19      As discussed above, the merchandise at issue here does not

20  fall into that place where it in itself *is* clearly expression.

21  Additionally, unlike the merchandise deemed protected in <u>Gaudiya</u>,

22  <u>One World</u>, and <u>Perry</u>, the merchandise here is not a walking

23  billboard.  While this conclusion standing alone may not deem the

24  sale of such material non-expressive, other circumstances also

25  counsel against finding Plaintiffs' sales inextricably intertwined

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27      [19]Such an approach likely is preferable.  In thinking about
    these issues, the Court is reminded of the jurisprudence on
28  probable cause in the Fourth Amendment context, which requires a
    case-by-case analysis based on the totality of the circumstances.

with expression.  That is, in Dowd's case, even if the symbols on
the coffin boxes contain some communicative element, or even if the
burning of incense has symbolism, the other circumstances suggest
that the primary purpose of the sale of the merchandise was to sell
a product as opposed to communicate a message.  Plaintiffs'
simultaneous activity in addition to selling the products include,
essentially, advertising the *products'* benefits; unlike Gaudiya,
this sale is not done "in conjunction with other activities in
order to disseminate" a message other than the products' benefit.
Gaudiya, 952 F.2d at 1064 ("The non-profit groups inform
individuals of their causes through distributing their literature,
engaging in persuasive speech, and selling merchandise with
messages affixed to the product.").  Additionally, Plaintiffs'
primary goals were to advertise and sell their products.  Overall,
these circumstances lead the Court to conclude that the merchandise
here was not sold in furtherance of communicating a non-commercial
message.

Hunt does not identify a religious, political, philosophical,
or ideological message he is trying to communicate,[20] and Hunt's
own description of his activities show that they constitute a pure
pitch of his product.  Hunt's "script" explains why shea butter is
beneficial, and mentions that it "comes from the shea nut from a
tree in Africa[] that's been around for hundreds of years."  The
use of the words "healing power" and the characterization of his

---

[20]The Court is mindful that a message need not be narrow,
succinctly articulable, or particularized to merit protection.
Hurley, 515 U.S. at 569.  However, the Court does not read the
jurisprudence to suggest that *no* message is necessary; Gaudiya
suggests otherwise.

area as the Garden of Eve does not turn this advertisement into an ideological, philosophical, or religious message in this context, where Hunt's focus is on emphasizing the product's effectiveness by noting that it has Vitamin A and Vitamin E, and helps cure stretch marks, scars, blemishes, eczema, and arthritis.  See Schaumburg, 444 U.S. at 630.  Dowd, too, largely promotes what he perceives as the benefits of his original incense flavor: the primary message Dowd attempts to convey at the Boardwalk is that he has "created and designed [his] own original flavor which [he] believe[s] is better than a lot of the other commercially available incense that are out there."  Dowd Depo. at 15:21-23.  While there is also a display summarizing the symbols on the coffin, Dowd's explanation of his interaction with customers is a pitch for the product.  See id. at 12:12-23.  The fact that the incense is Dowd's own creation does not automatically render it protected.

Indeed, Plaintiffs' activity is less intertwined with a political, ideological, religious, or philosophical message than that deemed insufficient in Al-Amin.  While the Al-Amin plaintiffs sold incense and oils at the same time they also sold religious books and pamphlets, see 979 F. Supp. at 169, 173, Plaintiffs here were not simultaneously engaged in dissemination of an idea or message apart from selling their merchandise.  Cf. ISKCON, 61 F.3d at 961 (Ginsburg, J., concurring) (distinguishing identification beads from ritual beads, and noting that the latter "beads may be an *aid* to spiritual activity, but they are not in themselves communicative").

In light of all of the circumstances surrounding this case, the Court finds that neither Hunt nor Dowd sell merchandise in a

45

1   way "inextricably intertwined" with protected expression.  The

2   predominant purpose of the sale is to make income from the sale of

3   the items rather than disseminate a message; to the extent we might

4   find meaning in the symbols on an item, the circumstances suggest

5   that these potential messages were merely tangential to the

6   promotion of a product.  To the extent there is speech inextricably

7   tied to the sale of items, it is commercial.  Accordingly,

8   Plaintiffs cannot challenge the ordinance as a facially invalid

9   time, place, or manner restriction on protected speech.[21]  See also

10  Subsection III(A) (discussing standing to challenge on overbreadth

11  grounds).

12          2.   2006 Ordinance as a Restriction on Commercial Speech

13       Because the parties briefly address it, the Court also briefly

14  addresses whether the Plaintiffs succeed in challenging the 2006

15  ordinance as an improper restriction on commercial speech.  Under

16  the test announced by the Supreme Court in Central Hudson, the

17  Court does not find the ordinance facially invalid.

18       In Central Hudson Gas & Electric Corp. v. Public Service

19  Commission of New York, 447 U.S. 557 (1980), the Supreme Court held

20  that where communication is commercial but neither misleading nor

21  related to unlawful activity, the speech may be restricted only

22  where (1) the government's interest in doing so is substantial, and

23  (2) the restriction is narrowly drawn to serve that interest.  447

24

25          [21]In holding that Plaintiffs are not engaged in fully
26  protected speech, the Court in no way suggests that all vendors
    prohibited from vending under the ordinance are engaged only in
27  commercial speech.  On the Court's reading of the ordinance, it
    provides a flat ban on the sale of, for example, all clothing, even
28  in circumstances like Gaudiya and Mastrovincenzo, where the sale of
    that exact merchandise was deemed fully protected.

1    U.S. at 565.  To be "narrowly drawn," the restriction must

2    "directly advance" the state interest involved, as opposed to

3    ineffectively or remotely doing so, and must be no more restrictive

4    than necessary to serve that government interest.  Id. at 564-65.

5         By prohibiting solicitation, the ordinance prohibits

6    commercial speech, i.e., "speech which does no more than propose a

7    commercial transaction."  Va. Bd. of Pharmacy v. Va. Citizens

8    Consumer Council, Inc., 425 U.S. 748, 762 (1976); see 42.15(b)(3)

9    (defining "vend or vending" to include "offer[s] for sale" and

10   "solicit[ing] offers to purchase").  Plaintiffs do not suggest that

11   City's interests in enacting this ordinance – ensuring a safe

12   passageway, protecting against "visual clutter," and protecting

13   against unfair competition – were not substantial.  Rather,

14   Plaintiffs generally argue that the ordinance was not "narrowly

15   drawn."  See Pls.' Opp. to Def.'s Mot. Summ. J., at 19-20.[22]

16        The Court disagrees, and Plaintiffs do not articulate a clear

17   argument to the contrary.  By prohibiting vending except under

18   certain circumstances, the prohibition on vending directly serves

19   the City's interests in decreasing visual clutter and providing a

20   clear passageway because it decreases the demand for vending space.

21   Additionally, prohibiting the solicitation of such items also

22   serves the City's unfair competition goals.  The regulation is also

23   "narrowly tailored" as that term is used in the commercial speech

24   context.  The Supreme Court has rejected the proposal that the

25   Central Hudson test requires the regulation to be the "least

26   restrictive means"; rather, the Court has required a fit between

27   ───────────────

28        [22]Both sides' arguments as to this inquiry do little more than
     quote the standard and assert that it is or is not met.

1  the means and ends chosen that "is not necessarily perfect, but

2  reasonable." Fox, 492 U.S. at 476-77, 480.  The types of

3  ordinances struck down under this prong were "substantially

4  excessive, disregarding 'far less restrictive and more precise

5  means." Id. at 479 (quoting Shapero v. Ky. Bar Ass'n, 486 U.S.

6  466, 476 (1988)).  Plaintiffs have not suggested alternatives that

7  meet that standard.  The ordinance does not prohibit all

8  leafletting or soliciting of donations, but rather that which

9  solicits "in exchange for food, goods, merchandise, or services";

10  that is, the ordinance is not targeted at solicitation in and of

11  itself so much as at vending; it proscribes solicitation to avoid

12  creating a giant loophole.  The Court does not address whether the

13  2006 ordinance would pass muster if it were considering this

14  ordinance in the context of a time, place, and manner inquiry or

15  addressing the discretion of enforcing officials in connection with

16  overbreadth.  See also Note 21, supra, p. 45.  However, the Court

17  cannot find the 2006 ordinance facially invalid under the

18  commercial speech analysis.

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**IV.   CONCLUSION**

    For the foregoing reasons, the Court grants Plaintiffs' Motion as to the Constitutionality of the 2004 version of LAMC § 42.15, and grants Defendant's Motion as to the 2006 version of the ordinance.

    It appears to the Court that the only issue remaining in this case are the various potential damages to which Plaintiffs may or may not be entitled with respect to the 2004 ordinance.

IT IS SO ORDERED.


Dated: January 14, 2009

                                        _____
                                        DEAN D. PREGERSON
                                        United States District Judge